# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ROBERT C. ALLAN,** *et al.* | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | )     **Civil Case No. 17-338 (RJL)** |
| | ) |
| **ISLAMIC REPUBLIC OF IRAN,** | ) |
| | ) |
| | ) |
| **Defendant.** | ) |

**FILED**

MAR 2 5 2019

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## MEMORANDUM OPINION
(March 25, 2019) [Dkt. ## 27, 55]

Plaintiffs are survivors of the terrorist hijacking of TWA Flight 847 from Athens, Greece on June 14, 1985, as well as immediate family members and estate representatives. Plaintiffs seek money damages against Iran for injuries and trauma caused by Iran's provision of material support to the hijackers pursuant to 28 U.S.C. § 1605A, the terrorism exception of the Foreign Sovereign Immunities Act ("FSIA"). Having considered all of the record evidence, I find that plaintiffs have established grounds for default. I therefore, for the following reasons, **GRANT** plaintiffs' motion for default on liability, *see* Plaintiffs' Motion for Default Judgment on Liability ("Pls.' Mot. on Liability") [Dkt. # 27], and also **GRANT** plaintiffs' motion for relief totaling $353 million dollars, consistent with the findings of the appointed Special Master as to damages. *See* Plaintiffs' Motion for Default Judgment on Damages ("Pls.' Mot. on Damages") [Dkt. # 55].

## BACKGROUND

On June 14, 1985, two Hezbollah hijackers boarded TWA Flight 847 leaving Athens, Greece headed for Rome, Italy. Amended Complaint ("Compl.") [Dkt. # 11] ¶ 18. There were 143 passengers and 8 crewmembers on board at the time, 69 of whom are passenger plaintiffs in this case. *Id.* Shortly after takeoff, the two hijackers ran up the aisle towards the cockpit waving guns and hand grenades, shouting: "Americans come to die!" *Id.* ¶ 19; *see also* Pls.' Mot. on Liability at 4–5 (citing evidence relied on in *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 80 (D.D.C. 2002)).[1] They held the three pilots at gunpoint and ordered them to fly to Iran or Algeria. Compl. ¶ 20; *see also* Pls.' Mot. on Liability, Ex. 2 (*Stethem* Transcript, Testimony of Christian Zimmerman) ("Zimmerman Testimony")), at 123:14–124:19. When informed that the plane did not have enough fuel to fly to either location, the hijackers instructed the pilots to land in Beirut, Lebanon. Compl. ¶ 20.

What ensued was dramatic and terrifying. The hijackers forced some passengers into the First Class cabin and beat them repeatedly. Compl. ¶ 21; Pls.' Mot. on Liability at 5. They began to single out passengers who they suspected of being U.S. Military or Jewish. Compl. ¶ 16, 26; Pls.' Mot. on Liability, Ex. 2 (*Stethem* Transcript, Testimony of Clinton Suggs) ("Suggs Testimony")), at 87:1–90:23. They interrogated passengers about

---

[1] For the reasons explained below, *infra* at 5–6, this Court will consider the factual findings and evidence presented in *Stethem*, which covered the same incident, and will reference testimony and declarations submitted in that case, where necessary.

their religions. *Id.* ¶ 16. All seated passengers were forced to sit in a crash-landing position for hours at a time, and were forbidden from going to the bathroom. *Id.* ¶ 21. The terrorists landed the plane in Beirut for the first time three hours later on June 14th. Pls.' Mot. on Liability at 6; *see also id.*, Ex. 28 (Zimmerman Timeline) at 124. They demanded the release of nearly 800 prisoners in Israel and Kuwait. Compl. ¶¶ 22–24. In exchange for fuel, they released several women and children. Pls.' Mot. on Liability, Ex. 28 (Zimmerman Timeline) at 124.

The hijackers then ordered the pilots to fly the plane to Algiers, Algeria. Compl. ¶ 23. After refueling again, they ordered the pilots to return to Beirut. *Id.* ¶ 23–24. The airport authorities ordered the plane not to land, and placed obstacles on the runway to enforce the order. *Id.* ¶ 24. Despite the dangerous conditions, the pilots were able to safely land on the runway. *Id.* On the ground in Beirut for a second time, the hijackers demanded that additional terrorists be allowed to board. *Id.* ¶ 25. They executed one passenger—a navy diver named Robert Stethem—and tossed his body onto the tarmac. *Id.* Later that day, ten additional militiamen from the Amal group and one Hezbollah spokesman boarded the plane. *Id.*; Pls.' Mot. on Liability, Ex. 28 (Zimmerman Timeline) at 126. The plane then headed back to Algeria for a second time. *Id.* ¶ 27. During this period, the hijackers began ramping up their harassment and abuse—threatening passengers with execution, beating them, and robbing them of all their belongings. *Id.* ¶ 26–27; Pls.' Mot. on Liability, Ex. 4 (Pls.' Decls.) at 6–7, 84, 441, 452. On the ground in Algeria, the terrorists released another swatch of passengers in exchange for an additional hijacker being allowed to board.

3

Compl. ¶ 28.

On the morning of June 16, the hijackers ordered the plane back to Beirut for a third time. Pls.' Mot. on Liability, Ex. 28 (Zimmerman Timeline) at 129. At that point, the passengers still on board had endured 36 hours on the aircraft with inadequate food, water, access to bathroom facilities, or sleep. *Id.* The plane sat on the tarmac until the next morning, when 23 men were forced off the plane at gunpoint and taken into Beirut. *Id.* at 130; Compl. ¶¶ 28–29. For the next two weeks, the men were beaten, threatened, given inadequate food and water, and forced to watch propaganda. Compl. ¶ 28. The terrorists finally released the Beirut hostages to Syrian military personnel on June 30, 1985. *Id.* ¶ 29. The hijackers were indicted for their roles in the hijacking, but never taken into United States custody. *See* Pls.' Mot. on Liability at 10. They remain on the FBI's most wanted list. *Id.* at 11 n. 11.

Plaintiffs filed this action on February 24, 2017, seeking default judgment on liability and damages. On May 23, 2017, plaintiffs served Iran via diplomatic channels. Iran never accepted service, so the Clerk entered default on July 26, 2017. On February 2, 2018, plaintiffs moved to appoint a special master to review their claims for damages. *See* Motion for Order Appointing a Special Master for Damages [Dkt. # 24]. I appointed Special Master Alan Balaran to make findings on plaintiff's motion for default as to damages. *See* 2/12/18 Order [Dkt. # 25]. After reviewing testimonial and documentary evidence, he issued a Report and Recommendation awarding compensatory damages on August 28, 2018. *See* Special Master Report Filed Under Seal [Dkt. # 54].

4

## ANALYSIS

**I.    Iran is Liable Under the FSIA's Terrorism Exception—28 U.S.C. § 1605A**

Plaintiffs argue that Iran should be held liable under the FSIA's terrorism exception,

28 U.S.C. § 1605A, for providing material support to the terrorist groups that perpetrated

the 1985 hijacking incident aboard TWA Flight 847. I begin by noting that this is not the

first time the events at issue have been the subject of suit under the FSIA. In 2002, Judge

Thomas Penfield Jackson granted default judgment in two consolidated cases involving the

same 1985 hijacking incident under an older provision of the FSIA, § 1605(a)(7). *See*

*Stethem v. Islamic Republic of Iran,* 201 F. Supp. 2d 78, 85 (D.D.C. 2002). The two

consolidated cases before Judge Jackson included the individual who was killed on the

plane, Robert Stethem, as well as his surviving family members.[2]  Keeping in mind that

"the FSIA does not require this Court to relitigate issues that have already been settled," I

find that there are grounds to take judicial notice of these "related proceedings and records

in cases before the same court." *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43,

54 (D.D.C. 2009) (quoting *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d.

229, 263 (D.D.C. 2006) (internal quotation marks omitted)); *see also Valore v. Islamic*

*Republic of Iran*, 700 F. Supp. 2d 52, 60 (D.D.C. 2010) ("[T]he Court may review evidence

considered in an opinion that is judicially noticed, without necessitating the re-presentment

of such evidence.").

---

[2] None of the *Stethem* plaintiffs are plaintiffs in the instant case.

5

I will therefore grant plaintiff's request to take judicial notice of Judge Jackson's findings of fact, Ex. 1, and to consider the expert and witness testimony, Ex. 2, and relevant documentary evidence, Ex. 11–28, presented in *Stethem*. Pls.' Mot. on Liability at 34–35. I will also consider the updated expert report submitted by Dr. Clawson, the expert who previously submitted testimony on which Judge Jackson relied. Ex. 3; *Stethem*, 201 F. Supp. 2d at 92.[3]

To find default judgment for the plaintiffs, I must first determine whether I have jurisdiction under the FSIA. Section §1605A(a)(1) imposes three requirements to establish subject matter jurisdiction: 1) that the claims be against a foreign state that was designated a state sponsor of terrorism at the time the acts occurred, § 1605A(a)(2)(A)(i); 2) that plaintiffs be U.S. nationals at the time the acts occurred, § 1605A(a)(2)(A)(ii); and 3) that plaintiffs be seeking money damages for personal injury or death caused by the foreign state's acts of torture, extrajudicial killing, aircraft sabotage, and hostage taking, or by the foreign state's provision of material support or resources for such acts. § 1605A(a)(1); *see also Owens v. Republic of Sudan,* 864 F.3d 751, 778 (D.C. Cir. 2017). Having considered the record evidence, I find that plaintiffs satisfy each of these requirements in the instant case.

---

[3] Dr. Clawson is apparently an expert on Iran and has studied its sponsorhip of terrorism, among other things, as Director of Research at the Washington Institute for Near East Policy. Pls.' Mot. on Liability at 3 n. 6.

## A. Iran Was a State Sponsor of Terrorism at the Time of the Hijacking

First, as plaintiffs argue, Iran was designated a state sponsor of terrorism on January 19, 1984, and remained a designated state sponsor of Hezbollah at the time of the hijacking. *See* Pls.' Mot. on Liability, Ex. 11 (Statement of U.S. Secretary of State, 49 Fed. Reg. 2836-02); *Stethem*, 201 F. Supp. 2d at 85 (relying on evidence that Iran is the "patron state" of Hezbollah); Pls.' Motion on Liability, Ex. 3 (Clawson Expert Report) at ¶¶ 23, 38–39, 51 (Iran committed substantial support to fund Hezbollah's acts of "terrorism as an official means of forwarding foreign policy" in the early 1980s).[4]

## B. Plaintiffs Meet the Requirements of U.S. Citizenship

Second, the record shows that all of the passenger plaintiffs were U.S. citizens at the time of the hijacking, and all but one of the family member plaintiffs were U.S. Citizens at the time of the hijacking. *See* Pls.' Mot. on Liability, Ex. 4 (Pls.' Decls.) (attaching birth

---

[4] Plaintiffs have submitted numerous other contemporaneous US government documents noting Iran's contribution to Hezbollah's terrorist operations, *see* Pls.' Mot. on Liability at 10–14, but I do not believe it necessary to rely on those public documents here. Suffice it to say that Iran's role in funding Hezbollah's terrorist activities at the time was well-documented and has been found by courts in this district to be beyond dispute. *See, e.g.*, *Estate of Doe v. Islamic Republic of Iran,* 808 F. Supp. 2d 1, 15–16 (D.D.C. 2011) ("[Iran's] connections to Hizbollah have been explored at length in this jurisdiction, and it has uniformly been agreed that, in the relevant time period, Hizbollah received substantial funds and support from Iran via its Ministry of Information and Security and the Iranian Revolutionary Guard Corps," thus finding that "defendants provided 'material support and resources' to Hizbollah in carrying out both the [April 1983 and September 1984] attacks on the U.S. Embassy and Embassy Annex in Beirut, Lebanon."); *Levin v. Islamic Republic of Iran*, 529 F. Supp. 2d 1, 14 (D.D.C. 2007) ("It has been well established within the intelligence, academic, and legal communities that Iran, the MOIS, and the IRGC were providing material support and resources to Hizbollah in the early 1980's . . . .").

certificates, U.S. passports, and naturalization papers). The family member that was not a citizen herself was married to a U.S. Citizen at the time of the hijacking, and is therefore a claimant whose injuries derive from her citizen husband. *See Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 570 (7th Cir. 2012) ("the plain text and plain meaning of § 1605A(a)(2)(A)(ii) extends jurisdiction to cases where either 'the claimant or the victim was, at the time of the [terrorist] act' a United States citizen. The claimant and victim need not both be American citizens.").

## C. Iran Provided Material Support to the Terrorist-Hijackers

Finally, plaintiffs are seeking "money damages ... against [Iran] for personal injury or death that was caused by an act of torture . . . aircraft sabotage, hostage taking, or the provision of material support or resources for such an act . . . ." FSIA § 1605A(a)(1). In *Stethem*, Judge Jackson determined that Iran had indeed provided "material support" to Hezbollah and Amal for the hijacking and hostage taking, including funding, training, logistical and weapons support, and professional guidance and tactical expertise. 201 F. Supp. 2d at 87 ("[A]s the Court has previously found in so many similar cases before it, the evidence conclusively establishes that the Islamic Republic of Iran and its MOIS provided 'material support or resources' to Hizballah, and Hizballah and its co-conspirator Amal were the perpetrators of these heinous acts of terrorism."). Because the FSIA did not provide an independent federal cause of action at the time of *Stethem*, plaintiffs had to prove that they met the elements of their D.C. state law claims (in that case, wrongful death and survival claims), and additionally had to prove that the court had jurisdiction under the

8

FSIA. *Id.* at 87–88.

In 2008, however, Congress replaced § 1605(a) with § 1605A and created a private, federal cause of action against foreign governments in § 1605A(c) so that plaintiffs are no longer required to prove state law claims to secure relief. *See Owens*, 864 F.3d at 765. However, the causation requirement—that plaintiff's injury result from material support of acts of terrorism—has not changed, and the language in § 1605A(a)(2) largely mirrors the prior language in § 1605(a)(7). *Owens*, 864 F.3d at 796–99. Most courts have interpreted this so-called "jurisdictional causation" requirement loosely, finding that where a foreign government's support of terrorist activities could be shown generally, plaintiffs need not prove whether the government had "provided material support and resources that caused *this particular act.*" *See Shoham v. Islamic Republic of Iran*, No. 12-cv-508, 2017 WL 2399454, at *10, 16-17 (D.D.C. June 1, 2017) (internal quotation marks omitted); *Owens*, 864 F.3d at 794–99 (finding jurisdictional causation where defendant-Sudan provided safe harbor and preferential tax treatment to al Qaeda, despite Sudan's ignorance of al Qaeda's specific plans to launch attacks on US embassies in Africa). Having considered the record evidence in this case, I find, consistent with Judge Jackson's opinion in *Stethem*, that Iran provided "material support" to terrorist groups Hezbollah and Amal sufficient to meet the requirements of § 1605A(a)(1).

### D. Plaintiffs Suffered Personal Injuries as a Result of the Hijacking

It still remains for me to consider whether the 69 passengers and their families who bring this lawsuit have adequately met the statutory requirement of *personal injury* in the

9

instant case. § 1605A(a)(1). Having considered the record evidence, I find that they do. As is clear from plaintiffs' declarations, they have all undoubtedly established valid theories of recovery for assault, battery, false imprisonment, and intentional infliction of emotional distress. And even more clear is the fact that "plaintiffs' personal injuries arise from their having been taken hostage and tortured by agents of the defendant[ ]." *Stethem*, 201 F. Supp. 2d at 91 n. 20.

Plaintiffs' declarations paint a harrowing tale of the events that transpired aboard TWA Flight 847, as well as the conditions of captivity for some passengers for two weeks afterwards in Beirut. Even those only on the aircraft for the first day of the siege were forced to sit for prolonged periods in a crash-landing position; refused access to food and water; prevented from using lavatories; and either subjected to or witness to abuse by their captors. *See* Pls.' Mot. on Liability, Ex. 2 (*Stethem* Transcript (Zimmerman Testimony)), at 127:4-10; *id.*, Ex. 4 (Pls.' Decls.), at 6–7, 84–85, 126, 337, 452. This included being "punched, kicked, pistol whipped, sexually assaulted, poked with gun barrels, frisked and robbed, pushed, and/or slapped." *Id.* at 43 (citing Ex. 4 ("Pls.' Decls.), at 43, 84, 222, 231, 275, 441, 497). Some passengers were also questioned about race, religion, and occupation for the purpose of being singled out for potential execution. *Id.*, Ex. 2 (*Stethem* Transcript, Suggs Testimony), at 88:1–8, 91:4–6. In many cases, moreover, passengers travelling with family members faced the additional terror of watching close family be subjected to such abuse. *Id.*, Ex. 4 (Pls.' Decls.) at 67–68, 194, 242, 418. And, of course, for about a third of the passengers, the terror did not end with the plane made its final stop in Beirut.

Twenty-three male passengers endured an additional two weeks of captivity in Beirut, during which they were subjected to mock executions, threatened, beaten, and held captive in apartments, garages, and basement prisons. *Id.*, Ex. 4 (Pls.' Decls.) at 44, 85, 164, 453, 468, 526.

As for the family member "spouse[s], parents, siblings, and children," *Heiser*, 659 F. Supp. 2d at 28, their declarations "alleging emotional distress arising from a terrorist attack that killed or injured a family member," clearly satisfy Section 1605A's jurisdictional injury requirement, even though many were not present at the scene. *Owens*, 864 F.3d at 812 (certifying question of presence requirement for IIED claims to D.C. Court of Appeals); *Republic of Sudan v. Owens*, 194 A.3d 38, 45 (D.C. 2018) ("We see little need to enforce the presence requirement in IIED cases where the jurisdictional elements of § 1605A are satisfied and the plaintiff's severe distress arises from a terrorist attack that killed or injured a member of his or her immediate family."). Indeed, the "'intent to create maximum emotional impact,' particularly on third parties, is terrorism's *raison d'être.*" *Heiser*, 659 F. Supp. 2d at 27 (quoting *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 9 (D.D.C. 2000)); *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 344 (D.D.C. 2016) ("Claims for solatium under the FSIA are nearly indistinguishable from claims for intentional infliction of emotional distress.").

Plaintiffs have therefore established all of the jurisdictional requirements laid out

by Section 1605A(a).[5] What remains for me to consider is whether plaintiffs have met

Section 1605A(c)'s requirement to state a "theory of liability" on which defendants can be

held liable for plaintiff's injuries.

As stated above, plaintiffs here have submitted voluminous declarations alleging

tort claims for assault, battery, false imprisonment, and the intentional infliction of

---

[5] Though plaintiffs have not raised it, the FSIA terrorism exception contains a limitation
period, which provides that an action must be brought not later than the latter of (1) 10
years after April 24, 1996; or (2) 10 years after the date on which the cause of action arose
unless plaintiffs have timely commenced a "related" or "prior action" under the old §
1605(a)(7). 28 U.S.C. § 1605A(b). Under this limitations provision, the last day to file a
new action under § 1605A was April 24, 2006. Nevertheless, the D.C. Circuit has
unequivocally stated that the limitations provision in the FSIA's terrorism exception is *non-
jurisdictional*. *Owens*, 864 F.3d at 802 ("[n]othing in § 1605A(a) 'conditions its
jurisdictional grant on compliance with [the] statute of limitations' in § 1605A(b)")
(quoting *Musacchio v. United States*, 136 S.Ct. 709, 717 (2016)). Therefore, where
defendants do not raise it as an affirmative defense, it is considered wavied unless courts
exercise their discretionary authority to raise the limitation as a defense *sua sponte*. *See
Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 331 (D.D.C. 2014) ("declin[ing]
whatever discretionary authority [the Court] may have to raise the defense of limitations
on Iran's behalf"); *cf. Maalouf v. Islamic Republic of Iran*, 306 F. Supp. 3d 203, 212
(D.D.C. 2018) ("Considering the timeliness of an FSIA claim sua sponte is a discretionary
determination."). Recognizing that the FSIA strikes a "careful balance" between comity
and accountability, *see Rubin v. Islamic Republic of Iran*, 138 S.Ct. 816, 822 (2018), I
decline to exercise my discretion to raise the timeliness defense here for several reasons.
First, defendants have, so far, chosen not to appear in this litigation and raise the limitations
defense. There is little argument for comity, as Iran remains a state sponsor of terrorism,
and no friend of the United States. And plaintiffs raise claims related to the very factual
circumstances under which Judge Jackson previously granted relief to the passenger who
was killed during the hijacking. Moreover, the D.C. Circuit's overview of the textual
history of the limitations provision in *Owens* clearly demonstrates that Congress did not
intend for courts to consider the limitation as a bar to jurisdiction, but rather to consider
the timeliness issue on a case-by-case basis. 864 F.3d at 802–04.

emotional distress., all "well-established principles of law, such as those found in the Restatement (Second) of Torts…" *Worley*, 75 F. Supp. 3d at 335. While the FSIA technically requires plaintiffs "to prove a theory of liability" separate and apart from establishing the elements of subject matter jurisdiction, *Owens,* 864 F.3d at 807 ("[T]he question whether a statute withdraws sovereign immunity is analytically distinct from whether a plaintiff has a cause of action.") (internal citation omitted), most courts conduct the analysis together, since evidence sufficient to establish jurisdictional causation will almost always establish a theory of "personal injury" necessary to prevail under §1605A(c). *See, e.g.*, *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017) (finding that plaintiffs were entitled to relief under Section 1605A(c) after proving Section 1605A(a)'s jurisdictional requirements because of the "the overlap between the elements of this cause of action and the terrorism exception to foreign sovereign immunity"); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010) (summarily concluding that Section 1605A(c)'s cause of action requirement is satisfied when Section 1605A(a) jurisdiction is found). Because "plaintiffs' personal injuries arise from their having been taken hostage and tortured by agents of the defendants[,]" I need not "belabor the issue of liability by addressing the independent elements of each separate tort claim advanced by [each of] the plaintiffs." *Stethem*, 201 F. Supp. 2d at 91 n. 20.

## II. Compensatory Damages Should be Awarded Consistent with the Special Master's Recommendation

Plaintiffs also seek an order awarding compensatory damages. *See generally* Pls.'

Mot. on Damages. A party seeking default damages under the FSIA "must prove damages 'in the same manner and to the same extent as any other default winner.'" *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 243 (D.D.C. 2012) (quoting *Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 160 (D.D.C. 2009)). Plaintiffs may meet this burden of proof by submitting "affidavits or declarations rather than through live witnesses testifying in open court," *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 20 (D.D.C. 2009), which the Court "may accept...as true." *Lanny J. Davis & Associates LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 163 (D.D.C. 2013).

While putting a price tag on the pain and suffering of passengers and their families is challenging, *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 163 (D.D.C. 2017) (recognizing the "challenge aris[ing] in assigning a dollar value to such pain and suffering"), there are, fortunately, a plethora of prior decisions in this Circuit awarding damages for pain and suffering to victims of terrorist attacks. The Special Master here diligently considered these decisions, and devised a framework by which to group plaintiffs' injuries in a way that is both consistent with prior practice and internally consistent between plaintiffs. *See* Pls.' Mot. on Damages, Addendum A – Recommended Damages, at 6–13. Namely, he considered the severity of the pain immediately following the injury, the lasting and severe psychological problems resulting from the injuries, and the overall length and severity of captivity.

Starting with "the baseline assumption that persons suffering [physical] injuries in terrorist attacks are entitled to $5 million in compensatory damages," *Davis v. Islamic*

*Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012), and that those who suffer emotional, but no physical injury are typically awarded $1.5 million in damages, *see, e.g.*, *Relvas v. Islamic Republic of Iran*, Case No. 14-01752, 2018 WL 1092445, *2 (D.D.C. Feb. 28, 2018), the Special Master divided plaintiffs according to the "gravity of harm" as revealed by their "shared experiences." Special Master Report Filed Under Seal [Dkt. # 54] at 9.[6]

For passenger plaintiffs, the Special Master recommended relief under three sub-categories: For the 15 passengers ("Group I") who were "forced to sit for prolonged periods in cramped and painful positions; refused access to the lavatories; subjected to unsanitary conditions; denied food and water; and were subjected to or forced to watch mock executions," but were ultimately released within the first day of the hijacking, he awarded $1,000,000. *Id.* at 9–11. For the 27 passengers ("Group II") who were "subjected to 35 additional hours of the same abuse," and also "faced a possible crash-landing; heard the gunshot that killed a fellow passenger; listened while other passengers were brutally beaten; saw the swollen and bloodied bodies of the terrorists' victims; capitulated to the demands of heavily-armed Amal militia; [were] robbed of their valuables; and watched helplessly as their captors wired the aircraft with plastic explosives," the Special Master awarded $2,000,000. *Id.* And for the 23 passengers ("Group III") who were held captive

---

[6] The Special Master varied upwards from his established baseline amounts in a few limited instances, for passenger plaintiffs Simon Grossmayer, Jane Synnestvedt, Estate of John Testrake, Arthur Toga, Debbie Toga, and Estate of Frank Walsh. Without revealing confidential information regarding these plaintiffs, suffice it to say that I agree with his decisions to deviate from the baseline for these individuals.

in Beirut for an extra two weeks and suffered additional abuse, including being "lined up against a wall—'execution-style'; repeatedly threatened with death; tormented with false promises of release; housed in locations surrounded by exploding shells and mortar fire; confined to rooms with no beds, working toilets or sanitary facilities; supplied with tainted food and water; and bombarded with anti-American propaganda," he awarded $5,000,000. *Id.*

The Special Master conducted a separate analysis to determine the appropriate baseline loss of solatium for family members whose loved ones "survived a terrorist attack." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 n. 10 (D.D.C. 2011); *see also Wyatt*, 908 F. Supp. 2d at 232 (finding loss of solatium framework applied to "cases in which the victim survived a terrorist attack or hostage-taking"). Keeping in mind the principle that family members should not be awarded more than the victim, Special Master Report Filed Under Seal at 13–14, and considering analogous cases in our Circuit, *see id.* at 14–15, the Special Master recommended solatium awards for family members of victims commensurate with the groups above—for Group I, $660,000 for spouses, $560,000 for parents, $495,000 for children, and $330,000 for siblings; for Group II, $1,330,000 for spouses, $1,112,000 for parents, $990,000 for children, and $660,000 for siblings; and for Group III, $4,000,000 for spouses, $2,500,000 for parents, $1,500,000 for children, and $1,250,000 for siblings. *Id.* at 15.

Under these circumstances, plaintiffs are thus entitled to compensatory damages in the amounts listed above.[7] Moreover, I find that the relief outlined in the Special Master's report is consistent with that awarded in other cases. I therefore grant plaintiffs' motion for default judgment as to damages consistent with these amounts, as set forth in detail in the attached Appendix A–Damages, and totaling $353 million dollars.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** plaintiffs' motion for entry of default judgment as to liability [Dkt. # 27], and **GRANTS** plaintiffs' motion for entry of default according to the Special Master's recommendations on damages [Dkt. # 55]. An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

---

[7] Notably, the Special Master's recommended awards are within the range granted by Judge Jackson in *Stethem*. 201 F. Supp. 2d at 93 (awarding $5,000,000 each to the Stethem and his wife, and a range of $200,000 to $3,000,000 to other family members).

# APPENDIX A—DAMAGES

| Plaintiff | ECF. No. | Hostage/ Relationship | Group No. | Pain & Sufferings | Solatium | Total |
|---|---|---|---|---|---|---|
| Victor Amburgy | 0054-1 | Beirut Hostage | III | $5,000,000 | $4,000,000 | $9,000,000 |
| Jerome Barczak | 0054-1 | Beirut Hostage | III | $5,000,000 | $0 | $5,000,000 |
| Judy Cox Barkley | 0054-1 | Plane Hostage | II | $2,000,000 | $0 | $2,000,000 |
| Judith Chudigian | 0054-1 | Plane Hostage | I | $1,000,000 | $0 | $1,000,000 |
| Cheryl Clancy | 0054-1 | Daughter of Plane Hostage | N/A | $0 | $495,000 | $495,000 |
| Stuart Darsch | 0054-1 | Beirut Hostage | III | $5,000,000 | $0 | $5,000,000 |
| Rev. Thomas Dempsey | 0054-1 | Beirut Hostage | III | $5,000,000 | $0 | $5,000,000 |
| Jane Doe | 0054-1 | **Intentionally Blank** | | | | $3,500,000 |
| Martha Doris | 0054-1 | Plane Hostage | II | $2,000,000 | $990,000 | $2,990,000 |
| Sue Ellen Herzberg | 0054-2 | Plane Hostage | II | $2,000,000 | $4,000,000 | $6,000,000 |
| Hazel Hesp | 0054-2 | Plane Hostage | II | $2,000,000 | $0 | $2,000,000 |
| Elizabeth Howes | 0054-2 | Plane Hostage | II | $2,000,000 | $0 | $2,000,000 |
| Kenneth Lanham | 0054-2 | Plane Hostage | II | $2,000,000 | $0 | $2,000,000 |
| Rev. William McDonnell | 0054-2 | Plane Hostage | II | $2,000,000 | $0 | $2,000,000 |
| Mary Palesse | 0054-3 | Plane Hostage | II | $2,000,000 | $0 | $2,000,000 |

| Plaintiff | ECF. No. | Hostage/ Relationship | Group No. | Pain & Sufferings | Solatium | Total |
|---|---|---|---|---|---|---|
| Mauri Schwartz | 0054-3 | Plane Hostage | II | $2,000,000 | $0 | $2,000,000 |
| Sara Summers | 0054-3 | Plane Hostage | II | $2,000,000 | $0 | $2,000,000 |
| Ralf Traugott | 0054-3 | Beirut Hostage | III | $5,000,000 | $0 | $5,000,000 |
| Judith Ditchkus Brown | 0054-1 | Plane Hostage | II | $2,000,000 | $4,000,000 | $6,000,000 |
| Michael Bradley Brown | 0054-1 | Beirut Hostage | III | $5,000,000 | $1,330,000 | $6,330,000 |
| Robert Gordon Brown | 0054-1 | Beirut Hostage | III | $5,000,000 | $0 | $5,000,000 |
| Estate of Donna Jill Brown | 0054-1 | R.G. Brown (wife) | N/A | $0 | $4,000,000 | $4,000,000 |
| Melissa Gibson | 0054-1 | R.G. Brown (daughter) | N/A | $0 | $1,500,000 | $1,500,000 |
| Carolyn Byron | 0054-1 | Plane Hostage | II | $2,000,000 | $4,000,000 | $6,000,000 |
| Pam Byron | 0054-1 | Plane Hostage | II | $2,000,000 | $1,500,000 | $3,500,000 |
| Leo Byron | 0054-1 | Beirut Hostage | III | $5,000,000 | $1,330,000 | $6,330,000 |
| Allyn Conwell | 0054-1 | Beirut Hostage | I | $5,000,000 | $0 | $5,000,000 |
| Alexander Conwell | 0054-1 | Conwell (son) | N/A | $0 | $1,500,000 | $1,500,000 |
| Olga Conwell | 0054-1 | Conwell (wife) | N/A | $0 | $4,000,000 | $4,000,000 |
| Gisela Delgado | 0054-1 | Plane Hostage | I | $1,000,000 | $1,330,000 | $2,330,000 |
| Daniel Delgado | 0054-1 | Delgado (son) | N/A | $0 | $990,000 | $990,000 |
| Ralph Delgado | 0054-1 | Delgado (son) | N/A | $0 | $990,000 | $990,000 |
| Grant Elliott | 0054-1 | Beirut Hostage | III | $5,000,000 | $0 | $5,000,000 |

19

| Plaintiff | ECF. No. | Hostage/ Relationship | Group No. | Pain & Sufferings | Solatium | Total |
|---|---|---|---|---|---|---|
| Shirley Elliott | 0054-1 | Elliott (mother) | N/A | $0 | $2,500,000 | $2,500,000 |
| Barbara Guse | 0054-1 | Elliott (sibling) | N/A | $0 | $1,250,000 | $1,250,000 |
| Sherry Zenk | 0054-1 | Elliott (sibling) | N/A | $0 | $1,250,000 | $1,250,000 |
| Simon Grossmayer | 0054-1 | Beirut Hostage | III | $5,500,000 | $660,000 | $6,160,000 |
| Estate of Elaine Grossmayer | 0054-1 | Plane Hostage | I | $1,000,000 | $4,000,000 | $5,000,000 |
| Debra Ann Byrne | 0054-1 | Simon and Elaine Grossmayer's (daughter) | N/A | $0 | $1,500,000 | $1,500,000 |
| James Grossmayer | 0054-1 | Simon and Elaine Grossmayer's (son) | N/A | $0 | $1,500,000 | $1,500,000 |
| Simon Grossmayer Jr. | 0054-1 | Simon and Elaine Grossmayer's (son) | N/A | $0 | $1,500,000 | $1,500,000 |
| Nora Jan Mangano | 0054-1 | Simon and Elaine Grossmayer's (daughter) | N/A | $0 | $1,500,000 | $1,500,000 |
| Maria Renee Olsen | 0054-1 | Simon and Elaine Grossmayer's (daughter) | N/A | $0 | $1,500,000 | $1,500,000 |
| Estate of Peter Hill | 0054-2 | Beirut Hostage | III | $5,000,000 | | $5,000,000 |
| Nina Hill | 0054-2 | Hill (daughter) | N/A | $0 | $1,500,000 | $1,500,000 |
| Paul Hill | 0054-2 | Hill (son) | N/A | $0 | $1,500,000 | $1,500,000 |
| Roxanne Hill | 0054-2 | Hill (daughter) | N/A | $0 | $1,500,000 | $1,500,000 |
| James W. Hoskins, Jr. | 0054-2 | Beirut Hostage | III | $5,000,000 | $0 | $5,000,000 |

| Plaintiff | ECF. No. | Hostage/ Relationship | Group No. | Pain & Sufferings | Solatium | Total |
|---|---|---|---|---|---|---|
| Kathryn Hoskins | 0054-2 | Plane Hostage (wife) | II | $2,000,000 | $0 | $2,000,000 |
| Deanna Hoskins | 0054-2 | Hoskins (James's mother) | N/A | $0 | $2,500,000 | $2,500,000 |
| Estate of James W. Hoskins, Sr. | 0054-2 | Hoskins (James's father) | III | $0 | $2,500,000 | $2,500,000 |
| Tracie Rhinesmith | 0054-2 | Hoskins (James's sibling) | N/A | $0 | $1,250,000 | $1,250,000 |
| Tanya Vanderpool | 0054-2 | Hoskins (James's sibling) | N/A | $0 | $1,250,000 | $1,250,000 |
| Analie Townsend | 0054-2 | Hoskins (Kathryn's mother) | N/A | $0 | $1,112,000 | $1,112,000 |
| Susan Hudson | 0054-2 | Hoskins (Kathryn's sibling) | N/A | $0 | $660,000 | $660,000 |
| Estate of Raymond Johnson | 0054-2 | Beirut Hostage | III | $5,000,000 | $660,000 | $5,660,000 |
| Estate of Margaret Johnson | 0054-2 | Plane Hostage | I | $1,000,000 | $4,000,000 | $5,000,000 |
| Alfred Johnson | 0054-2 | Johnson (son) | N/A | $0 | $1,500,000 | $1,500,000 |
| Mary Brown | 0054-2 | Johnson (daughter) | N/A | $0 | $1,500,000 | $1,500,000 |
| Kathleen Flanagan | 0054-2 | Johnson (daughter) | N/A | $0 | $1,500,000 | $1,500,000 |
| Joseph Johnson | 0054-2 | Johnson (son) | N/A | $0 | $1,500,000 | $1,500,000 |

| Plaintiff | ECF. No. | Hostage/ Relationship | Group No. | Pain & Sufferings | Solatium | Total |
|---|---|---|---|---|---|---|
| Barbara J. Lamping | 0054-2 | Johnson (daughter) | N/A | $0 | $1,500,000 | $1,500,000 |
| George Lazansky | 0054-2 | Beirut Hostage | III | $5,000,000 | $1,330,000 | $6,330,000 |
| JoAnn Lazansky | 0054-2 | Plane Hostage | II | $2,000,000 | $4,000,000 | $6,000,000 |
| Rev. James W. McLoughlin | 0054-2 | Beirut Hostage | III | $5,000,000 | $495,000 | $5,495,000 |
| Estate of Loretta McLoughlin | 0054-2 | Plane Hostage | I | $1,000,000 | $2,500,000 | $3,500,000 |
| Estate of Ed Novak | 0054-2 | Plane Hostage | II | $2,000,000 | $660,000 | $2,660,000 |
| Estate of Janet Novak | 0054-2 | Plane Hostage | I | $1,000,000 | $1,330,000 | $2,330,000 |
| Richard Novak | 0054-2 | Novak (son) | N/A | $0 | $990,000 | $990,000 |
| Delores Kowalczyk | 0054-2 | Plane Hostage | II | $2,000,000 | $0 | $2,000,000 |
| Edward Kowalczyk | 0054-2 | Kowalczyk (husband) | N/A | $0 | $1,330,000 | $1,330,000 |
| Estate of Esther Peel | 0054-3 | Plane Hostage | I | $1,000,000 | $2,500,000 | $3,500,000 |
| Kristine Peel | 0054-3 | Plane Hostage | II | $2,000,000 | $4,000,000 | $6,000,000 |
| Estate of Robert Henry Peel | 0054-3 | Plane Hostage | II | $2,000,000 | $2,500,000 | $4,500,000 |
| Robert James Peel | 0054-3 | Beirut Hostage | III | $5,000,000 | $1,330,000 | $6,330,000 |

| Plaintiff | ECF. No. | Hostage/ Relationship | Group No. | Pain & Sufferings | Solatium | Total |
|---|---|---|---|---|---|---|
| Estate of Genevieve Porter | 0054-3 | Plane Hostage | I | $1,000,000 | $1,330,000 | $2,330,000 |
| Estate of Douglas Porter | 0054-3 | Plane Hostage | II | $2,000,000 | $660,000 | $2,660,000 |
| John Porter | 0054-3 | Porter (son) | N/A | $0 | $990,000 | $990,000 |
| Barbara Porter Neri | 0054-3 | Porter (daughter) | N/A | $0 | $990,000 | $990,000 |
| Dorothy Sullivan | 0054-3 | Plane Hostage | I | $1,000,000 | $0 | $1,000,000 |
| Robert C. Allan | 0054-3 | Sullivan (son) | N/A | $0 | $495,000 | $495,000 |
| Deborah Jorgensen | 0054-3 | Sullivan (daughter) | N/A | $0 | $495,000 | $495,000 |
| Blake Synnestvedt | 0054-3 | Plane Hostage | III | $5,000,000 | $1,330,000 | $6,330,000 |
| Jane Synnestvedt | 0054-3 | Plane Hostage | II | $10,000,00 | $4,000,000 | $14,000,000 |
| Estate of John Testrake | 0054-3 | Beirut Hostage | III | $7,000,000 | $0 | $7,000,000 |
| Phyllis Lyon | 0054-3 | Testrake (wife) | N/A | $0 | $4,000,000 | $4,000,000 |
| Debra Barnes | 0054-3 | Testrake (daughter) | N/A | $0 | $1,500,000 | $1,500,000 |
| Diane Smith | 0054-3 | Testrake (daughter) | N/A | $0 | $1,500,000 | $1,500,000 |
| Christine Cooke | 0054-1 | Plane Hostage | II | $2,000,000 | $660,000 | $2,660,000 |
| Estate of Arlene Turner | 0054-3 | Plane Hostage | II | $2,000,000 | $660,000 | $2,660,000 |

| Plaintiff | ECF. No. | Hostage/ Relationship | Group No. | Pain & Sufferings | Solatium | Total |
|---|---|---|---|---|---|---|
| David Matanes | 0054-3 | Turner (son) | N/A | $0 | $990,000 | $990,000 |
| Arthur Toga | 0054-3 | Beirut Hostage | III | $6,000,000 | $660,000 | $6,660,000 |
| Debbie Toga | 0054-3 | Plane Hostage | I | $1,250,000 | $4,000,000 | $5,250,000 |
| Robert Trautmann | 0054-3 | Beirut Hostage | III | $5,000,000 | $660,000 | $5,660,000 |
| Irma Trautmann | 0054-3 | Plane Hostage | I | $1,000,000 | $4,000,000 | $5,000,000 |
| Ashley Trautmann Longoria | 0054-3 | Plane Hostage | I | $1,000,000 | $1,500,000 | $2,500,000 |
| Katherine Trautmann Edlund | 0054-3 | Plane Hostage | I | $1,000,000 | $1,500,000 | $2,500,000 |
| Christos Varelogiannis | 0054-3 | Plane Hostage | II | $2,000,000 | $0 | $2,000,000 |
| Helen Koufogazos | 0054-3 | Varelogiannis (daughter) | N/A | $0 | $990,000 | $990,000 |
| Estate of Frank Walsh | 0054-3 | Plane Hostage | II | $3,000,000 | $1,330,000 | $4,330,000 |
| Kathleen Walsh | 0054-3 | Plane Hostage | II | $2,000,000 | $1,330,000 | $3,330,000 |
| Estate of Claude Whitmoyer | 0054-3 | Beirut Hostage | III | $5,000,000 | $0 | $5,000,000 |
| Judy Cox | 0054-3 | Whitmoyer (wife) | N/A | $0 | $4,000,000 | $4,000,000 |
| Tracy Camponeschi | 0054-3 | Whitmoyer (daughter) | N/A | $0 | $1,500,000 | $1,500,000 |
| Daniel Whitmoyer | 0054-3 | Whitmoyer (son) | N/A | $0 | $1,500,000 | $1,500,000 |

| Plaintiff | ECF. No. | Hostage/ Relationship | Group No. | Pain & Suffering | Solatium | Total |
|---|---|---|---|---|---|---|
| Stevens Willett | 0054-3 | Beirut Hostage | III | $5,000,000 | $1,112,000 | $6,112,000 |
| Marsha Willett | 0054-3 | Plane Hostage | I | $1,000,000 | $4,000,000 | $5,000,000 |
| Christopher Willett | 0054-3 | Plane Hostage | II | $2,000,000 | $1,500,000 | $3,500,000 |
| Joshua Willett | 0054-3 | Plane Hostage | I | $1,000,000 | $1,500,000 | $2,500,000 |